## HADLEY *v.* HADLEY.

1. DIVORCE—EXTREME CRUELTY—SERVICE IN ARMED FORCES—EVIDENCE.

Fact that defendant husband volunteered for service in armed forces did not constitute a basis for charge of extreme cruelty in wife's suit for divorce, under record presented.

2. SAME—EXTREME CRUELTY—INCREASED USE OF INTOXICATING LIQUORS—EVIDENCE.

Where wife greeted returning husband who had spent upwards of five years in the armed forces with indicated lack of love and affection and he thereupon increased his consumption of alcoholic liquors but not to the point where it prevented him from conducting his usual business affairs, and it did not affect his attitude toward his wife, such drinking *held,* not to have constituted extreme cruelty upon which wife could base suit for divorce.

3. SAME—NONSUPPORT—EVIDENCE.

In wife's suit for divorce, ground of nonsupport was not sustained either as to period while husband was serving in armed forces while country was at war, as to period of about seven months while they were living at her parents' home when he offered to share the expenses of maintaining the home, or as to subsequent period when they were living apart without any justifiable reason on her part.

4. HUSBAND AND WIFE—HUSBAND'S OBLIGATION TO SUPPORT WIFE.

A husband's obligation to support his wife ceases when she voluntarily leaves him without cause.

5. APPEAL AND ERROR—DIVORCE—EVIDENCE.

A reviewing court ought not to reverse the determination of a trial court in a suit for divorce unless convinced that it must have reached a different conclusion had it occupied the position of the lower court under like circumstances.

REFERENCES FOR POINTS IN HEADNOTES

[2] 17 Am. Jur., Divorce and Separation, § 58.
[3] 17 Am. Jur., Divorce and Separation, § 153.
[4] 26 Am. Jur., Husband and Wife, § 340.
[5] 3 Am. Jur., Appeal and Error, § 897.

6. INJUNCTION—REGULATION OF DOMESTIC RELATIONS.

Injunctive relief is denied husband in restraining his wife from entertaining in her home or in appearing in public with a named man and any and all other male acquaintances, not members of her family and other than the husband, since the jurisdiction of a court of equity does not extend to the regulation of domestic relations, a dissatisfied party being relegated to dissolution of marital relations.

7. COSTS—DIVORCE—INJUNCTION.

No costs are awarded appellant husband, where wife's bill for divorce is dismissed and his cross bill for injunctive relief to regulate her conduct is also dismissed.

Appeal from Wayne; Jayne (Ira W.), J. Submitted January 7, 1949. (Docket No. 37, Calendar No. 44,261.) Decided February 28, 1949.

Bill by Dorothy Jeanne Hadley against Charles S. Hadley for divorce on ground of extreme and repeated cruelty. Cross bill by defendant against plaintiff for injunction restraining plaintiff from associating with another man. Decree for plaintiff. Defendant appeals. Reversed and bills dismissed.

*Louis J. Colombo*, for plaintiff.

*Harrison T. Watson*, for defendant.

SHARPE, C. J. This is an appeal from a decree granting plaintiff a divorce.

Plaintiff was born in Chicago of Canadian parents who returned to Canada when she was five or six years old. She resided there continuously thereafter until she came to Detroit in 1941. The parties were married in Windsor, Canada, on March 17, 1934. At the time of the marriage, defendant was connected with a lumber manufacturing concern. He is a British subject and had been an officer in the Canadian army in World War I, but was not on active reserve when Canada entered World War II.

Following the marriage of the parties, defendant rented and furnished a home in Chatham, Ontario. Plaintiff entertained in their home and was never denied the right to have people in for dinner. She was supplied with domestic help, had access to defendant's credit, a charge account at Chatham's largest department store, and had her own automobile. The parties did the normal amount of entertaining and in the period between 1934 and 1940 they lived a normal life.

In August, 1940, defendant, then 44 years of age and without being drafted, voluntarily went on duty as a captain in the armed forces of Canada. He left Canada for England on February 5, 1941. Until 1945, he served in Great Britain as a training officer. He participated in several engagements and was promoted to a major and later to a lieutenant colonel. He returned to Canada and was discharged from all military duties on October 23, 1945. During the time defendant was overseas the parties corresponded regularly and exchanged gifts on suitable occasions. The record indicates that the normal, happy marital attitudes continued, despite the continued separation. At the time defendant went into service, he told plaintiff that he did not expect her to stay exclusively at home, but to continue normal social activities. During this period she accepted social invitations from various men and appeared in public with them. A Mr. X, who became a close friend of her family and was a business associate with her father, took her to social functions with some degree of regularity.

Before departing for overseas defendant gave plaintiff a power of attorney so that she could have access to his cash, bank accounts, securities and insurance. At this time defendant held insurance on his life totalling $36,000 with cash or borrowing value of approximately $10,000, subject to a pre-

mium loan of $1,500 and annual premium payments of $1,576. During the time defendant was in service plaintiff received an allotment of defendant's military pay. While he was receiving $160 a month as a captain, she received $100. This amount was increased as he was promoted to the extent that she received $177.50 per month when defendant became a lieutenant colonel.

Prior to defendant's return, tentative arrangements were made for him to enter a business enterprise with plaintiff's father, but they did not materialize. Following defendant's return from service, he stayed at the home of plaintiff's parents, who were then living in Grosse Pointe, until May, 1946 when plaintiff's mother ordered him to remain away from her home. In May, 1947, defendant moved to Chatham, Ontario, and set up a business. He reestablished a residence there and invited plaintiff to return to Canada, but she refused to do so. It also appears that since defendant returned from service abroad, plaintiff has undergone a serious operation, the expense of which has not been paid for by defendant.

The cause came on for trial and the trial court granted plaintiff a divorce on the grounds of nonsupport and cruelty. It is to be noted that the cruelty and nonsupport are largely based on the fact that defendant volunteered to serve his country in a time of its greatest need and at a time when the lights of civilization were growing dim. The patriotic service defendant rendered to his country cannot be the basis for a charge of cruelty under the circumstances of this case.

Plaintiff urges that defendant indulged in excessive drinking which constituted cruelty. It does appear that upon defendant's return from service

abroad, he temporarily increased his alcoholic consumption of liquor.

Plaintiff testified:

"Up until the time my husband went into the service and then went overseas, we had a normal, happy marriage."

The greeting defendant received upon his return from overseas is well shown by the testimony of plaintiff:

"I first revealed to him that I had no longer any love and affection for him. When I saw him get off the train I just felt differently. After all after five years makes a lot of difference. Just like a complete stranger. He appeared to be a stranger. His absence of five years had that effect on me. His long absence destroyed my love and affection for him. We stayed at a hotel that night. I did not have any relations with him at all there. The reason I gave for refusing to have marital relations with him was I just couldn't force myself. I wasn't feeling awfully well either."

Possibly the reception defendant received as above related may have been his reason for finding solace in an extra "nip" to placate his feelings for the loss of a warm and affectionate wife. We have examined the record and do not find that the drinking defendant indulged in affected his attitude towards plaintiff or prevented him from conducting his usual business affairs. We are not able to say that defendant's drinking constitutes cruelty.

Plaintiff also charges defendant with nonsupport. There are three phases of the married life of these parties that bear a relationship to this claim. The first phase was the time during which defendant was in the armed service of his country. We think the record is replete with evidence that defendant amply made it possible for plaintiff to have all of the neces-

sities and many of the comforts of life. The second phase of the nonsupport charge relates to a period of approximately 8 months when defendant lived at the home of plaintiff's parents. The record shows that defendant was an invited guest in this home and offered to pay a share of the cost of maintaining the home, but was never told how much he should pay. We do not think defendant can be charged with non-support under these circumstances. The third phase of nonsupport relates to the time subsequent to the month of May, 1946, when defendant was invited to leave the McKiggan home by Mrs. McKiggan. It appears from the record that after this occurrence took place defendant attempted to make provisions for the support of plaintiff by making an initial deposit of $100 in a Detroit bank and informing her that this deposit would be supplemented by further deposits. Citation of authority is unnecessary to establish the principle that a husband's obligation to support his wife living apart from him ceases when she voluntarily leaves him without cause. Under the facts established in this case plaintiff has failed to show a justifiable reason for living separate and apart from defendant.

In *Westgate* v. *Westgate,* 291 Mich. 18, we said:

"The reviewing court ought not to reverse the determination of the trial court unless convinced that it must have reached a different conclusion had it occupied the position of the lower court under like circumstances. *Brookhouse* v. *Brookhouse,* 286 Mich. 151; *Stratmann* v. *Stratmann,* 287 Mich. 94."

In reviewing the record in this case we are unable to find ourselves in agreement with the trial judge. The evidence produced in behalf of plaintiff does not warrant the granting of a divorce.

Defendant filed a cross bill of complaint by which he seeks injunctive relief restraining plaintiff from

"associating with, entertaining in her home or appearing in public with the particular man referred to herein and any and all other male acquaintances, not members of her family, and other than this cross-plaintiff."

In *Snedaker* v. *King,* 111 Ohio St. 225 (145 N. E. 15), plaintiff, one Grace King, brought a suit against defendant Jessie L. Snedaker for damages and to enjoin defendant from communicating in any manner with plaintiff's husband. Upon an appeal to the supreme court of Ohio, the court in a majority opinion said:

"Such extension of the jurisdiction of equity to regulate and control domestic relations, in addition to the legal and statutory remedies already provided, in our opinion is not supported by authority, warranted by sound reason, or in the interest of good morals or public policy. The opening of such a wide field for injunctive process, enforceable only by contempt proceedings, the difficulty if not impossibility of such enforcement, and the very doubtful beneficial results to be obtained thereby, warrant the denial of such a decree in this case, and require a modification of the judgment in that respect."

We are in accord with the views above expressed. It appears to us that if the conduct of plaintiff is of such a nature that defendant feels aggrieved, his relief should be relegated to a dissolution of the marital relations.

For the reasons stated the decree of the trial court is reversed and a decree will be entered here dismissing the bill of complaint and cross bill. No costs are allowed.

REID, NORTH, DETHMERS, and CARR, JJ., concurred with SHARPE, C. J.

BUSHNELL, BOYLES, and BUTZEL, JJ., concurred in the result.